```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS

 3                          No. 1:14-cr-10143-WGY

 4

 5   UNITED STATES OF AMERICA

 6

 7   vs.

 8

 9   JOSH A. WAIRI

10

11
                          *********
12

13             For Jury Trial Before:
               Judge William G. Young
14

15             EXCERPT TRANSCRIPT:
                Scott Kelley Testimony
16             "Sado-masochistic" language

17
               United States District Court
18             District of Massachusetts (Boston)
               One Courthouse Way
19             Boston, Massachusetts 02210
               April 29, 2015
20

21                        ********

22
            REPORTER: RICHARD H. ROMANOW, RPR
23               Official Court Reporter
               United States District Court
24    One Courthouse Way, Room 5510, Boston, MA 02210
                 bulldog@richromanow.com
25
```

```
 1                    A P P E A R A N C E S

 2


 3   SUZANNE SULLIVAN JACOBUS, ESQ.
     SETH B. ORKAND, ESQ.
 4      United States Attorney's Office
        J. Joseph Moakley U.S. Courthouse
 5      1 Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
 6      (617) 748-3605
        Email: Suzanne.sullivan@usdoj.gov
 7      For the United States


 8


 9   J.W. CARNEY, ESQ.
        J.W. Carney, Jr. & Associates
10      20 Park Plaza, Suite 1405
        Boston, Massachusetts 02216
11      (617) 933-0350
        Email: Jcarney@carneydefense.com
12   and
     BENJAMIN P. URBELIS, ESQ.
13      Urbelis Law, LLC
        98 North Washington Street, Suite 403
14      Boston, Massachusetts 02114
        (617) 830-2188
15      Email: Ben@urbelislaw.com
        For the defendant
16

17

18

19

20

21

22

23

24

25
```

```
 1            P R O C E E D I N G S
 2            (A portion of the direct examination of Inspector
 3   Kelley by Ms. Sullivan.)
 4            (EXCERPT begins.)
 5            MS. SULLIVAN:  Your Honor, the government moves to
 6   introduce what's been marked for identification as K as
 7   Number 53.
 8            THE COURT:  May I see it?
 9            (Looks.)
10            THE COURT:  Do you want to be heard on this,
11   Mr. Carney?
12            MR. CARNEY:  No, your Honor, no objection.
13            THE COURT:  Okay, thank you.  It may be admitted.
14            Exhibit K for identification is now Exhibit 53 in
15   evidence.
16            MS. SULLIVAN:  With the Court's permission, if I
17   might now put over, what was previously K, the Number
18   53?
19            THE COURT:  I've done it.
20            MS. SULLIVAN:  Oh, thank you, sir.  Thank you,
21   your Honor.
22            (Exhibit 53, marked.)
23            MS. SULLIVAN:  If you can put up Number 52, which
24   there has already been a stipulation to.  I just want to
25   ask you a question about it.
```

```
 1            (On screen.)
 2     Q.     Inspector Kelley, what if anything did your
 3     investigation reveal relative to Google?
 4     A.     On Google there was an e-mail address of
 5     "hotjamess" -- J-A-M-E-S-S, "1@gmail.com."  When we
 6     subpoenaed that information, the user name that was
 7     assigned to it was "JamesCND."
 8     Q.     (Pause.)  I want to ask you some questions, if I
 9     could, about your interview with Josh Wairi as it
10     relates to Drop Box.
11        What if anything did Josh Wairi tell you about an
12     account that he had with Dropbox.com?
13     A.     He admitted that he had a Drop Box account.  He
14     was unsure of what he used for a user name or an e-mail
15     address or his password.  But it's been a while, he
16     says, since he's used it.
17     Q.     And what if anything did he say he did relative to
18     images and videos of child pornography with Drop Box?
19     A.     He said that he's traded and uploaded images and
20     videos of child pornography using Drop Box.
21     Q.     Once or more than once?
22     A.     On more than one occasion.
23     Q.     Was he able to give you an estimate of how many
24     images he did, he uploaded to Drop Box?
25     A.     If I refer back to my report, I can give you that.
```

1  Q.     Would it refresh your memory if I asked you about
2  Page 3 of your report, the first paragraph?
3  A.     (Looks.)  He said that he, um, uploaded images of
4  child pornography onto Drop Box numerous times but could
5  not estimate how many images.
6  Q.     And what if anything did he do in terms of sharing
7  with others, um, access to his own Drop Box account?
8  A.     He would only share with people that he trusted,
9  people that would share with him.
10 Q.     And how did he do so, how did he actually share,
11 what would he have to do?  Tell us what he told you.
12 A.     He would allow people access, send links to them
13 so they could actually go onto his Drop Box account and
14 view the material.
15 Q.     And in addition to a link, did he also provide a
16 password?
17 A.     That's correct.
18 Q.     You said he told you he would only do that for
19 people he trusted.  According to Josh Wairi, did he ever
20 physically, in person, whether it was via skype or in
21 person or by phone, ever meet any of the individuals
22 whom he traded over Drop Box?
23 A.     No.
24 Q.     So when he admitted to you the e-mails which
25 contain links for the people that he traded with, had he

```
 1   previously traded with those same people before, for
 2   child porn?
 3   A.   On numerous occasions, correct.
 4   Q.   Since moving to the Beacon Street apartment,
 5   according to Josh Wairi, has he used any Drop Box
 6   account since then?
 7   A.   No.
 8   Q.   And according to Josh Wairi, the people whom he
 9   traded child pornography with, where are they from?
10   A.   He did not know.
11   Q.   Who are they?
12   A.   He didn't know.
13   Q.   What if any contact did he have with them outside
14   of the internet?
15   A.   There was none.
16   Q.   According to Josh Wairi, when was the most recent
17   time that he viewed images or videos of children being
18   sexually exploited?
19   A.   The previous day, April 16th, 2014.
20   Q.   And on which computer did he most recently view
21   child pornography on according to his interview with
22   you?
23   A.   His Dell main computer.
24   Q.   How many images and videos of children being
25   sexually exploited did Wairi admit that he himself
```

```
 1   possessed?
 2   A.   Hundreds.
 3   Q.   And according to the defendant, the majority of
 4   those images are from what?
 5   A.   From the images that he received from "Image
 6   Source," images and videos that he received from "Image
 7   Source."
 8   Q.   Were they also from other users whom he met on
 9   "Image Source"?
10   A.   Correct.
11   Q.   And according to the defendant, the content of his
12   child pornography collection varied from what to what?
13   A.   They varied from children exposing their genitals
14   to -- to quote him, "more hardcore children in sex
15   acts."
16   Q.   Did you have any conversation with the defendant
17   about whether there were any images of sado-masochistic
18   sexual behavior?
19   A.   I did.
20   Q.   What if anything did he tell you?
21   A.   He specifically recalled a video where a minor
22   prepubescent male was tied up with his hands and feet
23   behind his back and engaging in sexually-explicit
24   conduct with an adult.
25   Q.   Did he tell you that there was possibly some
```

```
 1   images or videos of sado-masochistic treatment of
 2   children?
 3   A.   Yes, he did.
 4   Q.   According to the defendant, when he viewed the
 5   images of child pornography, why did he do so?
 6   A.   He did it for his own sexual gratification.
 7   Q.   And what if anything did he do while he was
 8   viewing the videos and images?
 9   A.   That he would masturbate.
10   Q.   How often did the defendant masturbate to the
11   images of child pornography?
12   A.   He said it was on a weekly basis.
13   Q.   And according to the defendant, what did those
14   images and videos of children do to him?
15   A.   He admitted that the videos were sexually arousing
16   to him and the images.
17   Q.   I want to direct your attention to the
18   defendant's, um, students who he taught.
19   According to the defendant, how many images and videos
20   does he have of kids from his teaching?
21   A.   Josh Wairi admitted that he takes numerous
22   pictures with his, um -- innocent pictures of children
23   with his cell phone, with a camera that's his own, and
24   he usually makes collages and stuff like that for the
25   kids at the end of the year and he puts together like a
```

```
 1  slide show for the children.
 2  Q.    According to the defendant how many images and
 3  videos has he taken from these children whom he's
 4  taught?
 5  A.    Hundreds.
 6  Q.    Okay.  And I want to ask you, when you wrote your
 7  report, if there's anything that's in quotes, is that
 8  coming directly from the defendant?
 9  A.    That's correct.
10  Q.    I want to direct your attention to Page 3 of your
11  report, sir, and ask you, the seventh paragraph down,
12  does that refresh your memory as to the exact quote that
13  the defendant gave you?
14  A.    That's correct.
15  Q.    And what did he say?
16  A.    Wairi stated he has, quote, "hundreds and hundreds
17  of images and videos of kids from his teaching."
18  Q.    And what did he go on to tell you after that?
19  A.    He said there was nothing illegal about those
20  images, that he took them with his phone and his
21  personal camera and he was not aware of any policy in
22  Somerville or Cambridge for using his personal devices
23  to take pictures of the students under his control.
24  Q.    And then at the end of the school year, according
25  to the defendant, what did he do for the students?
```

```
 1   A.    That he would make a slide show and a video
 2   collage of the students to show them, at the end of the
 3   year, their progress for the year.
 4   Q.    And what did you ask him about that?
 5   A.    I asked if he ever took any inappropriate images
 6   of children or was he ever present when an inappropriate
 7   picture of a child was taken.
 8   Q.    And what happened then?
 9   A.    Josh Wairi said he didn't want to answer that
10   question.
11   Q.    Did he continue to speak to you?
12   A.    He did.
13   Q.    And what did he tell you next?
14   A.    I moved on at this point, um, and I asked him if
15   he ever had a child touch him inappropriately or if he
16   ever touched a child inappropriately?  In which he
17   denied.
18   Q.    Did you have any conversations with the defendant
19   about, um, babysitting?
20   A.    I did.
21   Q.    Tell us about that.
22   A.    I asked Josh -- in talking with Josh, he told us
23   how he posted for the jobs on Craig's List to babysit
24   young children, that he was a teacher and that he was
25   really good with young kids and that he was hired by
```

```
 1   several families to be able to babysit.
 2   Q.   And, "yes" or "no," did he give you information
 3   about families who he babysat for including the ages of
 4   children?
 5   A.   Yes, he did.
 6   Q.   Okay. After he provided you with that
 7   information, did Josh Wairi say something else to you?
 8   A.   He did.
 9   Q.   What did he tell you?
10   A.   Um, if I may quote from my report?
11   Q.   If that would refresh your memory.
12   A.   Correct.
13   "Mr. Wairi stated, 'You may not believe me but,' quote,
14   'I would never hurt any of these kids. I never took any
15   pictures of these kids.' Wairi stated, quote, 'I know
16   it's not right, but looking at pictures is one thing,
17   but I would never hurt a kid'," end quote.
18   Q.   And was that in context to the babysitting
19   questions that you had just asked him?
20   A.   That's correct.
21   Q.   Did your interview continue?
22   A.   It did.
23   Q.   Inspector Kelley, did Josh Wairi provide you with
24   information as to who he was sexually attracted to?
25   A.   He did.
```

| | | |
|---|---|---|
| 1 | Q. | And what did he admit? |
| 2 | A. | He admitted he was sexually attracted towards boys |
| 3 | | from 18 to 13 years old. |
| 4 | Q. | Did you say 18 to 13? |
| 5 | A. | Oh, excuse me, 8 to 13 years old. |
| 6 | Q. | And according to the defendant, was that his ideal |
| 7 | | age for a child? |
| 8 | A. | That's correct. |
| 9 | Q. | And did he say he was sexually attracted to |
| 10 | | children? |
| 11 | A. | Yes. |
| 12 | Q. | And according to the defendant, the images and |
| 13 | | videos in his collection of children, um, are as young |
| 14 | | as what age, according to the defendant? |
| 15 | A. | According to the defendant he mentioned that there |
| 16 | | are some videos and some images that could have minors |
| 17 | | as young as seven or eight years old. |
| 18 | Q. | (Pause.) Inspector Kelley, have you had an |
| 19 | | opportunity to review the vast amount of the forensic |
| 20 | | evidence in this case? |
| 21 | A. | Yes, I have. |
| 22 | Q. | And in your view, sir, of what you've seen |
| 23 | | forensically, are there images of children younger than |
| 24 | | seven or eight? |
| 25 | A. | Yes. |

```
 1  Q.    What if anything did the defendant tell you about
 2  infants?
 3  A.    He said that he was not interested in infants at
 4  all, he thought that it was gross and that it made him
 5  sick.
 6  Q.    (Pause.)  And during the course of the interview
 7  with him, Inspector Kelley, you did previously talk
 8  about, um, the sado-masochistic treatment of children
 9  that the defendant talked to you about?
10  A.    That's correct.
11  Q.    And in your review of the forensic evidence in
12  this case, did you see any images or depictions of S and
13  M pertaining to children?
14  A.    No.
15  Q.    Who was the forensic examiner in this case that
16  conducted the complete examination?
17  A.    Our analyst, Mark Chaccone.
18  Q.    And that would be within his duties and
19  responsibilities?
20  A.    That's correct.
21  Q.    What is meant by the "file-sharing program," if
22  you know, Inspector Kelley?
23  A.    The "file-sharing program" would be, um, like a
24  Gnutella network, any kind of going out into a network
25  and searching for images, um, in a peer-to-peer file-
```

```
 1   sharing program.
 2   Q.   And what if anything did the defendant say
 3   relative to any file-sharing programs?
 4   A.   He denied that he was using any.
 5   Q.   Did he provide information to you about who the
 6   internet provider for his residence at Beacon Street
 7   was?
 8   A.   Yes.
 9   Q.   And what information did he provide?
10   A.   He said that it was Comcast.
11   Q.   All right.  Did he also say that that was a
12   wireless internet in the residence secured with a
13   password?
14   A.   That's correct.
15   Q.   At some point in time later in the interview did
16   you go back and ask Mr. Wairi again if he ever took a
17   picture of a child inappropriately?
18   A.   Yes, I did.
19   Q.   And at that point in time what observations did
20   you make of the defendant?
21   A.   After going back and asking him that question
22   again Josh Wairi kind of put his head down a little bit,
23   there was a quiet pause there where no one was talking,
24   and I told Josh, I said, "Josh, there's a truck outside
25   right now that's forensically looking at your computers,
```

```
 1   you know, and we're going to find -- if there's
 2   something out there, we're going to find it."
 3   Q.    And at that point you were in communication with
 4   the folks who were actually outside tasked with doing
 5   this sort of on-site forensic exam, correct?
 6   A.    That's correct.
 7   Q.    So when after you told Mr. Wairi that, um, what
 8   happened?
 9   A.    At that point Josh said that he admitted that he
10   took a video, um, in the locker room at the Kennedy pool
11   using his cell phone, that he was videotaping the kids,
12   um, getting changed in and out of their bathing suits,
13   and he described exactly how he did it.
14         (*EXCERPT* ends.)
15
16                    C E R T I F I C A T E
17
18         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,
19   do hereby certify that the foregoing record is a true
20   and accurate transcription of my stenographic notes, of
21   the aforementioned *EXCERPT*, before Judge William G.
22   Young, on April 29, 2015, to the best of my skill and
23   ability.
24   /s/ Richard H. Romanow 05-07-15
25   _____
     RICHARD H. ROMANOW    Date
```